**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| WALLEY'S AUTO SALES, INC. d/b/a WALLEY'S MARINE & AUTO SALES, on behalf of itself and all others similarly situated,<br><br>  Plaintiff,<br><br> v.<br><br>GRAY TELEVISION, INC.; HEARST COMMUNICATIONS; HEARST TELEVISION, INC.; NEXSTAR MEDIA GROUP, INC.; TEGNA INC.; TRIBUNE MEDIA COMPANY; and SINCLAIR BROADCAST GROUP, INC.,<br><br>  Defendants. | Civil Case No.:<br><br>ANTITRUST CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ..................................................................................... 1

JURISDICTION AND VENUE ...................................................................... 2

PLANTIFFS.................................................................................................... 3

DEFENDANTS .............................................................................................. 3

AGENTS AND CO-CONSPIRATORS .......................................................... 5

FACTUAL ALLEGATIONS .......................................................................... 5

    A.    The Department of Justice Investigation .................................... 5

    B.    The Local Television Advertising Market ................................. 6

        1.    The Structure and Characteristics of The Market For Local Television Advertising Supports The Existence of a Conspiracy .................................................................... 11

            a.    The Local Television Industry is Rapidly Consolidating .................................................... 12

            b.    Several Challenges Restrict Access to the Local Television Market ........................................... 13

            c.    Defendants Had Motives and Opportunities To Conspire with Each Other ................................ 16

CLASS ACTION ALLEGATIONS ................................................................ 21

INTERSTATE TRADE AND COMMERCE .................................................. 24

ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT.................................... 25

PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY ........... 26

PRAYER FOR RELIEF ................................................................................. 29

JURY DEMAND ........................................................................................... 31

i

Plaintiff WALLEY'S AUTO SALES, INC. d/b/a WALLEY'S MARINE & AUTO SALES ("Plaintiff"), by its undersigned attorneys, brings this action against Defendants based upon Defendants' conspiracy to artificially inflate the prices of local television advertisements in violation of the Sherman Act, 15 U.S.C. § 1. Plaintiff brings this action for itself and on behalf of all other persons and entities in the United States who paid for all or a portion of advertisement time on local TV provided by Defendants (the "Class"). Plaintiff bases its allegations upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and seeks for itself and the Class damages, injunctive relief, and other relief available pursuant to federal antitrust laws, demands a trial by jury, and alleges as follows:

**NATURE OF ACTION**

1.     This lawsuit arises from the unlawful coordination between advertisement sales teams of independent local television ("local TV") station owners to artificially inflate the prices of local TV advertisements in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.     Plaintiff seeks to represent a Class consisting of all persons and entities in the United States who paid for all or a portion of advertisement time on local TV provided by Gray Television, Inc., Hearst Communications, Inc., Hearst Television, Inc., Nexstar Media Group, Inc., Tegna Inc., Tribune Media Company, or Sinclair Broadcast Group, Inc. (collectively referred to herein as "Defendants") from at least January 1, 2014 until the effects of their unlawful conduct cease (the "Class Period").

1

3.    Defendants unlawfully coordinated efforts and shared information in order to artificially inflate prices for television commercials during the Class Period. Rather than compete for advertising sales on price, as competitors are supposed to do, Defendants and their co-conspirators shared proprietary information and conspired to fix prices and reduce competition in the market.

4.    On July 26, 2018, *The Wall Street Journal*, among other sources, reported that certain local television station owners were being investigated by United States Department of Justice ("DOJ") to determine whether communication between advertising sales teams led to artificially inflated rates for advertising time.[1]

## JURISDICTION AND VENUE

5.    Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other and further relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 28 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and

---

[1] D. FitzGerald & K. Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, WALL ST. J, July 26, 2018, *available at* https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979 (last accessed Oct. 1, 2018).

(d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

## PLANTIFFS

8.      Plaintiff Walley's Auto Sales, Inc. d/b/a Walley's Marine & Auto Sales is an Alabama corporation with its principal place of business located in Mobile, Alabama. During the Class Period, Plaintiff purchased advertisement time directly from one or more of the Defendants or their co-conspirators and has suffered monetary loss as a result of the antitrust violations alleged herein.

## DEFENDANTS

9.      Defendant, GRAY TELEVISION, INC. ("Gray TV"), is a television broadcast company headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319. Gray TV owns and operates television stations and digital assets in the United States. As of February 23, 2018, Gray TV owned and operated television stations in 57 television markets, broadcasting approximately 200 program streams, including approximately 100 channels affiliated with the CBS Network, the NBC Network, the ABC Network, and the FOX Network.

10.     Defendant, HEARST COMMUNICATIONS, INC. ("Hearst Communications"), headquartered at 300 West 57th Street, New York, New York 10019, is a diversified media and information Company.

11.     Defendant, HEARST TELEVISION, INC. ("Hearst TV"), headquartered at 300 West 57th Street, New York, New York 10019, is a wholly-owned subsidiary of Hearst Communications. Hearst Communications, through its wholly-owned subsidiary Hearst

TV, owns and operates televisions stations and cable networks throughout the United States. Hearst Communications and Hearst TV are collectively referred to hereinafter as "Hearst."

12.     Defendant, NEXSTAR MEDIA GROUP, INC. ("Nexstar"), headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062, operates as a television broadcasting and digital media company in the United States. As of December 31, 2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 markets.

13.     Defendant, TEGNA INC. ("Tegna"), is a broadcasting, digital media, and marketing services company headquartered at 7950 Jones Branch Drive, McLean, Virginia 22107. Tegna owns and operates 47 television stations in 39 markets across the United States.

14.     Defendant, TRIBUNE MEDIA COMPANY ("Tribune"), headquartered at 515 North State Street, Chicago, Illinois 60654, operates, through its subsidiaries, as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX, CW, CBS, ABC, MY, and NBC network television affiliates, as well as independent television stations; and broadcasts television series and movies on WGN America, a national general entertainment cable network. Tribune owns 43 broadcast television stations in approximately 35 cities.

15.     Defendant, SINCLAIR BROADCAST GROUP, INC. ("Sinclair"), headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030, operates as a

television broadcast company in the United States. As of December 31, 2017, Sinclair owned, operated, and/or provided services to 191 stations in 89 markets, which broadcast 601 channels.

## AGENTS AND CO-CONSPIRATORS

16.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

17.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

18.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

### A.     The Department of Justice Investigation

19.     On July 26, 2018, *The Wall Street Journal* reported that the DOJ is investigating whether Defendants Sinclair, Tribune, and other local television station owners unlawfully shared information and coordinated efforts to artificially raise prices for television commercials.[2] According to at least one other news report, Defendants Hearst, Nexstar, and Tegna are also involved in the DOJ probe.[3]

---

[2] *Id.*
[3] E. Mack, *DOJ Probes Sinclair, Other TV Stations for Ad Rate Collusion*, NEWSMAX, July 26, 2018, *available at* https://www.newsmax.com/newsfront/sinclair-tribune-fcc-ajit-pai/2018/07/26/id/874049/ (last accessed August 10, 2018).

20.     Specifically, the DOJ is investigating whether local television station owners "coordinated efforts when their ad sales teams communicated with each other about their performance" in order to artificially inflate local television advertising prices in violation of federal antitrust laws.[4]

21.     This investigation grew out of the DOJ's examination of Sinclair's proposed $4 billion acquisition of Tribune.[5]  The deal, announced in May of 2017, endured extensive review by the Federal Communications Commission ("FCC"). Despite speculation that the approval was imminent,[6] FCC Chairman Ajit Pai said that he had "serious concerns" regarding the merger.[7] On August 9, 2018, Defendant Tribune terminated the merger agreement with Defendant Sullivan.[8]

**B.**     **The Local Television Advertising Market**

22.     The local television landscape in the United States is made up of parent companies who own dozens of local TV stations that carry programming distributed through their broadcast platform, consisting of programming provided by third-party networks and syndicators, local news, their own networks, and other original programming.

---

[4] FitzGerald & Hagey, *supra*.

[5] *Id.*

[6] T. Johnson, *Justice Department investigating Sinclair, Tribune Media over ad sales communications*, CHICAGO TRIBUNE, July 27, 2018, *available at* http://www.chicagotribune.com/business/ct-biz-justice-department-sinclair-tribune-media-advertising-20180727-story.html (last accessed July 30, 2018).

[7] B. Miller, *DOJ investigating if Sinclair, Tribune collude on TV ad sales*, LA BIZ, July 26, 2018, *available at* https://www.bizjournals.com/losangeles/news/2018/07/26/doj-investigating-if-sinclair-tribune-colluded.html (last accessed July 30, 2018).

[8] J. Flint, *Tribune Terminates $3.9 Billion Merger With Rival Sinclair*, WALL ST. J., Aug. 9, 2018, *available at* https://www.wsj.com/articles/tribune-media-terminates-merger-with-sinclair-broadcase-group-1533810907 (last accessed Oct. 2, 2018).

23.    In 2016, the five largest companies in local TV were Sinclair, Nexstar, Gray, Tegna, and Tribune.[9] These companies owned, operated, or serviced 443 full-powered stations, a 147.5% increase from the number or local TV stations owned, operated, and serviced in 2004.[10] As discussed in more detail *infra*, a wave of consolidation and station purchases have made some broadcast media owners considerably larger.[11]



**Buying binge continues for local TV companies**

*Number of local TV stations owned by each company, as reported in SEC filings*

2004    2014    2016

208, upon tentative acquisition of Tribune

171, upon 2017 merger with Media General

Sinclair: 62, 150, 166
Gray: 28, 58, 85
Nexstar: 42, 82, 104
Tegna: 21, 46, 46
Tribune: 26, 42, 42

Note: Counts include stations that are reported in each company's SEC filing for each year ending Dec. 31 as being owned, operated or provided with programming and/or sales and other services. Low-power and satellite stations are excluded.
Source: Individual media company annual reports and SEC filings.

PEW RESEARCH CENTER

24.    The expansion of these major firms is a direct result of the deregulation by the FCC. The FCC sets limits on the number of broadcast stations an entity can own, as well as limits on the common ownership of broadcast stations and newspapers.[12] The FCC

---

[9] FitzGerald & Hagey, *supra*.
[10] *Id.*
[11] *Id.*
[12] *FCC Broadcast Ownership Rules,* FEDERAL COMMUNICATIONS COMMISSION, *available at* https://www.fcc.gov/consumers/guides/fccs-review-broadcast-ownership-rules (last accessed Aug. 10, 2018).

reviews its media ownership rules every four years to determine whether the rules are in the public interest and to repeal or modify any regulation it determines does not meet this criteria.[13]

25.     Until recently, the FCC restricted the combined number of television and radio stations that one party could own in a market to up two television stations and six radio stations, depending on the number of independent media voices in the market, and prohibited the common ownership of a radio or television broadcast station and a daily newspaper in the same market.[14] In November 2017, the FCC released an Ownership Order on Reconsideration that eliminated these restrictions effective February 7, 2018.[15]

26.     Additionally, under the National TV Ownership Rule adopted by the FCC, broadcast television companies are prohibited from individually owning a group of broadcast television stations that enables them to reach more than 39% of all U.S. television households.[16] The National TV Ownership rule is no longer subject to the FCC's quadrennial review.[17]

27.     Further, overlap of stations by different station owners is allowed via the "Local Television Duopoly Rule."[18] Specifically, a party may own television stations in adjoining markets, even if there is a digital noise limited service contour overlap between the two stations' broadcast signals, and generally may own two stations in the same market

---

[13] *Id.*
[14] *Sinclair Broadcast Group Inc, Form 10-K,* at 15, Mar. 1, 2018, *available at https://www.sec.gov/Archives/edgar/data/912752/000091275218000006/sbgi-20171231x10k.htm* (last accessed Oct. 2, 2018).
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at 16.

only (i) if there is no digital overlap between the stations; or (ii) not more than one station is among the top-four rated stations in the market ("the top-four rule"). Until recently, the FCC did not allow a party to own more than one station in the same market if there was digital overlap between the stations unless the market containing both the stations would contain at least eight independently owned full-power television stations post-merger ("the eight voices test").[19] The Ownership Order on Reconsideration eliminated the eight voices test and modified the top-four rule to permit parties to own up to two top-four rated stations in the same market on a case-by-case basis, effective on February 7, 2018.

28.     In a typical competitive market, local TV companies compete for audience share and advertising revenue with other televisions stations in their respective Designated Market Areas ("DMAs"). When taking an overview perspective at the industry, not every station is on equal footing; some competitors, who are part of larger organizations, have substantially greater financial, technical and other resources. According to Sinclair's 2018 10-K SEC filing, other factors that are material to a television stations' competitive position include signal coverage, local program acceptance, network affiliation or program service, audience characteristic and assigned broadcast frequency.[20]

29.     The sale of commercial inventory on respective television stations to advertising customers is a primary source of revenue for broadcasting companies, including Defendants. The objective of the local TV station owner is to meet the needs of their advertising customers by delivering to significant audiences in key demographics.

---

[19] *Id.*
[20] *Id.* at 21.

Local TV ad revenue can vary substantially from period to period based on a number of variables, primarily the stations ability to attract and maintain local, national and network advertising as well as the prominence of other forms of advertising.[21]

30.    The television industry must adapt to a rapidly changing market of consumers whose media preferences continue to lean away from traditional sources and towards digital channels. As discussed *infra*, local TV has been grappling with ratings erosion and viewers cancelling their television subscriptions, which adds to pressure on profit margins.[22]

31.    In recent years, television broadcasting companies have experienced a significant slowing of growth in advertising revenues.[23] The chart below shows that television advertising spending in the United States stalled in 2016 and then began to decline, which decline is projected to continue. Despite the decrease in television advertising spending, a primary source of revenue for television station owners, total revenues the U.S. local television industry are expected to reach $27.7 billion in 2018, up from $26.2 billion in 2017.[24]

---

[21] *Id.*

[22] C. Littleton, *Local TV Feels Squeeze Amid Station Consolidation*, VARIETY, July 25, 2017, *available at* https://variety.com/2017/tv/news/local-news-sinclair-tribune-nexstar-deal-1202506598/ (last accessed Aug. 10, 2018).

[23] *See* G. Mann, F. Venturini, & E. Malhotra, *The Future of Broadcasting V*, ACCENTURE (2016), *available at* https://www.accenture.com/t20170411T172611Z__w__/us-en/_acnmedia/Ac-ceture/next-gen/pulse-of-media/pdf/Accenture_Future_of_Broadcast_V_POV.pdf (last accessed Aug. 10, 2018).

[24] *BIA/Kelsey Reports Local Television Station Revenue Reached $28.4 B in 2016; Retransmis-sion Fees, Over-the-Air and Digital Revenue Contribute to a Strong Year*, BIA ADVISORY SER-VICES, Apr. 20, 2017, *available at* http://www.biakelsey.com/biakelsey-reports-local-television-station-revenue-reached-28-4-b-2016-retransmission-fees-air-digital-revenues-contribute-strong-year/ (last accessed Aug. 10, 2018).



32. Given the above factors, Defendants and their co-conspirators have responded to falling advertisement sales by colluding on pricing, forcing Plaintiff and members of the Class to pay supracompetitive prices for local television advertising.

### 1. The Structure and Characteristics of The Market For Local Television Advertising Supports The Existence of a Conspiracy

33. The structure and other characteristics of the market for local television advertising make it conducive to anticompetitive conduct among Defendants, and make collusion particularly attractive. Specifically, the local television advertising market (1) is in an industry that has been rapidly consolidating and is becoming increasingly concentrated; (2) has high barriers to entry; and (3) is comprised of participants with both motive and ample opportunities to conspire.

a.    **The Local Television Industry is Rapidly Consolidating**

34.    A highly-concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

35.    In response to decreased advertisement spending, the local television industry market has been consolidating in recent years.[25] This consolidation of the market continues as station owners look to increase their leverage with broadcast networks, which supply much of their programming, and pay-TV distributors, which carry their channels.[26] In 2013, "big owners of local TV stations got substantially bigger, thanks to a wave of station purchases."[27]

36.    Consolidation in the industry was also fueled by the May 8, 2017 announcement of the acquisition of Tribune by Sinclair, which would have created the largest station owner.[28]

37.    Thus, in February 2018, E.W. Scripps Co., another local television station owner indicated that its "priority is in-market consolidation to create duopolies."[29]

38.    Further, on June 25, 2018 Gray TV agreed to buy fellow television-station owner Raycom Media Inc. in a $3.65 billion deal that would create a company that reaches

---

[25] *See* Mann, *et al.*, *supra.*
[26] A. Hufford, *Gray TV to Buy Raycom in $3.65 Billion Deal,* WALL STREET JOURNAL, June 25, 2018, *available at* https://www.wsj.com/articles/gray-tv-to-buy-raycom-in-3-65-billion-deal-1529932732 (last accessed Oct. 2, 2018).
[27] D. Potter & K. Matsa, *A Boom in Acquisitions and Content Sharing Shapes Local TV News in 2013,* PEW RESEARCH CENTER, *available at* http://www.journalism.org/2014/03/26/a-boom-in-acquisitions-and-content-sharing-shapes-local-tv-news-in-2013/ (last accessed Aug. 10, 2018).
[28] *Id.*
[29] *More TV Consolidation Ahead As Major Players Plot Merger Plans,* INSIDE RADIO, Feb. 6, 2018, *available at* http://www.insideradio.com/free/more-tv-consolidation-ahead-as-major-players-plot-merger-plans/article_916a7dd8-0b0e-11e8-81c3-1b954ca8a63e.html (last accessed Aug. 10, 2018).

nearly a quarter of U.S. TV households.[30] If the Gray-Raycom deal is completed, the combined company would own 142 television stations in 92 U.S. markets, reaching 24% of TV households and owning the third-largest number stations.[31]



**b.** **Several Challenges Restrict Access to the Local Television Market**

39.     Basic economic principles dictate that a collusive arrangement that raises product prices above competitive levels would attract new market entrants seeking to exploit the pricing gap created by the conspiracy's supracompetitive pricing. The existence of significant barriers to entry, however, makes it unlikely that new entrants will enter the market. Thus, barriers to entry help facilitate the formation and maintenance of cartels and market-allocation agreements. Here, where high barriers to entry exist, new broadcast television companies are less likely to enter the market.

---

[30] Hufford, *supra*.
[31] *Id.*

40.     Even though convergence and technological changes have lowered certain barriers to entry, new entrants planning to enter into broadcasting markets typically face six critical barriers (1) governmental policy; (2) the presence of dominant broadcasters; (3) access to content; (4) audience behavior; (5) consumer costs; and (6) capital requirements.[32]

41.     Governmental policy, including regulatory or administrative practices may restrict market access. Responsible authorities take into account economic as well as cultural and social factors when issuing broadcasting licenses which may lead to distortions of competition.[33]

42.     The existing dominant broadcasters usually have long established relationships with their viewers and most likely also with advertisers. New entrants in the market would have to offer a better deal than the existing broadcasters in order to usurp any market share. Additionally, bigger companies have more clout to negotiate programming deals with networks or syndicators. "If you wanted a decent seat at the table talking to those guys, you had to have scale," said Barry Lucas, senior vice president of research at the investment firm Gabelli & Co. "Otherwise you were irrelevant and got

---

[32] Picard, R. G. and B. S. Chon (2004), *Managing Competition Through Barriers to Entry and Channel Availability in the Changing Regulatory Environment*, THE INTERNATIONAL JOURNAL ON MEDIA MANAGEMENT, vol. 6, no. 3&4, *available at* http://www.robertpicard.net/PDFFiles/man-agingcompetition.pdf (last accessed Aug. 10, 2018), at pp. 168-175.

[33]     *Competition Issues in Television and Broadcasting 2013*, OECD, *available at* http://www.oecd.org/daf/competition/TV-and-broadcasting2013.pdf (last accessed Aug. 10, 2018).

pushed around."[34] A newer entrant to the market would have to invest significant capital and time in establishing itself before it could work with networks.

43.     Additionally, successful entry into television broadcasting markets requires access at reasonable prices to desirable programming, including production and/or acquisition from third parties. Acquisition of this content, which is critical to attract viewers, is likely to constitute a significant cost to new market players.[35]

44.     Commercial broadcasters, whose operations are primarily financed through advertising fees, must establish within a short period of time an audience base that will also attract a sufficient number of advertisers.[36] Therefore, in the presence of established dominant broadcasters, new entrants must provide offers attractive enough to convince viewers to alter their already existing patterns of viewing and channel choice—a task that proves to be difficult.

45.     Most likely, new entrants to the market will offer television broadcasting services using cable, satellite, or digital terrestrial technologies—all of which require viewers to incur hardware related costs. The inconvenience and costs that viewers may encounter when switching between different television broadcasters have the potential of discouraging them from altering their established patterns of viewing. For example, consumers who switch from one cable television provider to another generally have to

---

[34] D. Potter & K. Matsa, *Impact of Consolidation on TV Economics*, PEW RESEARCH CENTER, Mar. 26, 2014, *available at* http://www.journalism.org/2014/03/26/impact-of-consolidation-on-tv-economics/ (last accessed Oct 2, 2018).
[35] *Competition Issues in Television and Broadcasting 2013*, OECD, supra, at p. 20.
[36] *Id.*

incur costs related to the rental or purchase of adequate equipment, such as set-top boxes and will have to trade in the old equipment for the new equipment.

46.     Finally, it would require considerable funding, time, and technical sophistication for a potential market entrant to gain the economies of scale and audience base achieved by Defendants necessary to compete in the market for local television advertising. For example, Sinclair "believe[s] the greatest opportunity for a sustainable and growing customer base lies within [its] local communities" which it has developed by training "a strong local sales force at each of [its] television stations, which is comprised of approximately 800 marketing consultants and 100 local sales managers company-wide."[37] Where the level of capital required is prohibitively high, it constitutes a significant barrier to entry.

### c.     Defendants Had Motives and Opportunities To Conspire with Each Other

47.     U.S. television advertising sales fell 7.8 percent to $61.8 billion last year, the steepest drop outside of a recession in at least 20 years, while sales at cable networks dropped for the first time in almost a decade.[38] According to data from MagnaGlobal, a resource that develops investment strategies for industry heads, there is no sign of a pickup in 2018, excluding cyclical events like the Olympics and the midterm elections.[39]

---

[37] *Sinclair Broadcast Group Inc, Form 10-K, supra.,* at 12.
[38] L. Shaw, *Advertisers Tuning Out TV in Sign of Trouble for Media Companies,* BLOOMBERG, Feb. 14, 2018, *available at* https://www.bloomberg.com/news/articles/2018-02-14/advertisers-tuning-out-tv-in-sign-of-trouble-for-media-companies (last accessed Aug. 10, 2018).
[39] *Id.*



**Drop in National TV Ads Forecast**
The ad-buying firm Magna said that national TV ad sales fell 2.2 percent in 2017. It predicted that they would decline at least 2 percent each year through 2022.

The forecast excludes local TV and ads from cyclical events like the Olympics and U.S. presidential campaigns.

By The New York Times | Source: Magna

48.  "In a healthy economy, we're looking at no growth in advertising from traditional media companies," said Michael Nathanson, an analyst with research firm, MoffettNathanson. "That's a worrying trend."[40] The decline in television viewership is accelerating as online rivals have increased their investments in the online video advertising market, capturing almost every new advertising dollar entering the marketplace.[41] Almost half of the growth in local video ad spending during the next five years will go to digital platforms, including local mobile video, local online video and out-of-home video, according to a new study on advanced television advertising published last

---

[40] *Id.*
[41] *Id.*

week by BIA/Kelsey industry analysts.[42] "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."[43]

49. According to Sinclair's most recent 10-K, a primary source of revenue for local television stations is "the sale of commercial inventory on . . . television stations to . . . advertising customers."[44] However, Sinclair also concedes that "advertising revenue can vary substantially from period to period based on many factors beyond [its] control."[45] Further, "[t]his volatility affects [its] operating results and may reduce [its] ability to repay indebtedness or reduce the market value of [its] securities."[46] Sinclair specifically admits that its "operating results depend on the amount of advertising revenue [it] generate[s]."[47]

50. As Defendants largely rely on revenue from local television advertising in order to sustain their daily operations, in the face of declining sales, Defendants had reason and motivation to conspire to artificially raise the prices of local TV advertisements.

51. Moreover, Defendants had numerous opportunities to meet and conspire with each other under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy. In particular, almost 300 full-power local TV stations changed hands in 2013 and many of these deals resulted in stations in the same market being separately owned on paper but operated jointly, a practice

---

[42] G. Arlen, *Digital Catching Up to Cable in Local Ad Sales*, MULTICHANNEL NEWS, *available at* https://www.multichannel.com/blog/digital-catching-cable-local-ad-sales-415657 (last accessed Aug. 10, 2018).
[43] *Shaw, supra.*.
[44] *Sinclair Broadcast Group Inc, Form 10-K, supra,* at 5.
[45] *Id.* at 21.
[46] *Id.*
[47] *Id.*

that has grown exponentially in recent years.[48] As of 2014, joint service agreements of one kind or another existed between Defendants and other local TV station owners in at least 94 markets, almost half of the 210 local television markets nationwide, and up from 55 in 2011.[49] Specifically, Sinclair admits that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."[50]

52.     Additionally, Defendants and their co-conspirators had numerous opportunities to conspire through industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), conferences and meetings held by those associations, and through merger negotiations.

53.     Hearst, Nexstar, Sinclair, Tegna, and Tribune are members of TVB.[51] Nexstar's President and CEO serves as the Chairman of TVB.[52] TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry."

---

[48] Potter, *et al.*, *supra.*
[49] *Id.*
[50] *Sinclair Broadcast Group Inc, Form 10-K, supra,* at 16.
[51] *TV Interface Practices (TIP) Initiative,* TVB, *available at* https://www.tvb.org/Public/Automated TV/TVInterfacePractices(TIP)Initiative.aspx (last accessed July 29, 2018); *Tribune Broadcasting Expands TVB Membership with Addition of 19 Local TV LLC Television Stations,* BUSINESS WIRE, Dec. 18, 2014, *available at*
https://www.busneswire.com/news/home/20141218005058/en/Tribune-Broadcasting-Expands-TVB-Membership-Addition-19 (last accessed Aug. 10, 2018).
[52] *Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions,* BUSINESS WIRE, Nov. 20, 2017, *available at*
https://www.businesswire.com/news/home/20171120005141/en/Local-Television-Broadcasters%E2%80%99-TIP-TV-Interface-Practices (last accessed Aug. 10, 2018).

TVB is designed to bring together and encourage information sharing among employees of broadcast television companies, including Defendants, and especially advertising sales representatives.[53]

54.     On November 20, 2017, a group of broadcast television companies, including Hearst, Nexstar, Sinclair, Tegna, and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners."[54] Nexstar's President and CEO made a public statement regarding TIP indicating that the industry "must work together as an industry."[55] President and CEO of Sinclair echoed this sentiment stating that "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales.[56] Tribune's President and CEO also indicated that through the TIP Initiative, Defendants could "actively work[] together."[57]

55.     Sinclair, Tribune, and other broadcast television companies are also members of the NAB, which describes itself as the "premier trade association for broadcasters."[58] Tegna's President and CEO and Hearst's President both serve on NAB's Executive Committee.[59] Gray TV's Chairman, President, and CEO, Nexstar's Chairman,

---

[53] *About TVB*, TVB, *available at* https://www.tvb.org/AboutTVB.aspx (last accessed July 29, 2018).
[54] *Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions, supra.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *About Us*, NAB, https://www.nab.org/about/default.asp (last accessed Aug. 10, 2018).
[59] *NAB Board of Directors*, NAB, https://www.nab.org/about/nabBoard.asp (last accessed Aug. 10, 2018).

President and CEO, Sinclair's President and CEO, and Tribune's COO all serve on the NAB Television Board of Directors.[60] NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

56.     Gray TV, Hearst, Nexstar, Sinclair, Tegna, Tribune, and several other local television station owners are also members of MRC.[61] MRC boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.[62]

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of itself and the following class (the "Class"):

> All persons and entities in the United States who paid for all or a portion of the cost of advertisement time directly to Defendants, or any current or former subsidiary or affiliate of Defendants, or any co-conspirator, during the period from at least and including January 1, 2014 until the effects of Defendants' unlawful conduct ceases. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, agents, co-conspirators, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

58.     While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is numerous given Defendants' substantial nationwide presence.

---

[60] *Id.*

[61] *2018 Membership*, MEDIA RATING COUNCIL, *available at* http://mediaratingcouncil.org/Member%20Companies.htm (last accessed Aug. 10, 2018).

[62] *The Benefits of MRC Membership*, MEDIA RATING COUNCIL, *available at* http://mediaratingcouncil.org/Benefits.htm (last accessed Aug. 10, 2018).

59.     Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy to restrict output and fix, raise, maintain or stabilize the prices of local television advertising time;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(f)     The effect of the alleged conspiracy on the cost of local television advertising time during the Class Period;

(g)     Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(h)     The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(i)     The appropriate class-wide measure of damages.

60.     Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for local television advertising time provided by Defendants and/or their co-conspirators.

61.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

62.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

63.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue

individually, substantially outweigh any difficulties that may arise in management of this class action.

64.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

65.     Billions of dollars of transactions in local television advertisements are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

66.     Defendants' manipulation of the market for the sale of local television advertising had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

67.     Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for local television advertising.

68.     Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of local television advertising, the prices of local television advertising would have been determined by a competitive, efficient market.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION,
## EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

69. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their price-fixing conspiracy.

70. Plaintiff and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein prior to disclosure of a DOJ investigation of certain Defendants on July 26, 2018.

71. The very nature of Defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by Plaintiff and members of the Class.

72. As alleged herein, Defendants' collusion to fix prices in the market for the sale of local television advertising was material to Plaintiff and members of the Class at all relevant times. Plaintiff or the Class members could not have discovered the violations until shortly before this litigation was commenced because Defendants and their co-conspirators used and continue to use deceptive methods to avoid detection and to affirmatively conceal their violations.

73. Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

74. During the limitations period, each of the Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including their collusion to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

75. Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class members' claims have been tolled.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

76. Defendants' antitrust conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to local television advertising;

(b) The prices of local television advertising have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c) Purchasers of local television advertising time have been deprived of the benefits of free and open competition; and

(d) Purchasers of local television advertising time paid artificially inflated prices.

77. The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of local television advertising time.

78. The precise amount of the overcharge impacting the prices of local television advertising time paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

79. By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for local television advertising time than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

### FIRST COUNT
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(Conspiracy in Restraint of Trade)**

80. Plaintiff repeats the allegations set forth above as if fully set forth herein.

81. From at least January 1, 2014 until the effects of their unlawful conduct ceases, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to local television advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

82. The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for local television advertising time in the United States.

83. In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)  participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of local television advertisements in the United States; and

(b)  participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

84.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of local television advertising time.

85.  Defendants' conspiracy had the following effects, among others:

(a)  Price competition in the market for local television advertisements has been restrained, suppressed, and/or eliminated;

(b)  Prices for local television advertisement time provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)  Plaintiff and members of the Class who purchased local television advertisement time from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

86.  Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for local television advertising

time purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

87.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

88.     Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or

device having a similar purpose or effect;

D.      That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.      That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: October 5, 2018    Respectfully submitted,

          By: */s/ Steven A. Kanner*
          Steven A. Kanner
          Michael J. Freed
          Robert J. Wozniak
          FREED KANNER LONDON & MILLEN LLC
          2201 Waukegan Road, Suite 130
          Bannockburn, IL 60015
          (224) 632-4500
          skanner@fklmlaw.com
          mfreed@fklmlaw.com
          rwozniak@fklmlaw.com

          Robert S. Kitchenoff
          WEINSTEIN KITCHENOFF & ASHER LLC
          100 South Broad Street, Suite 705
          Philadelphia, PA 19096
          (215) 545-7200
          kitchenoff@wka-law.com

          *Counsel for Plaintiff and the Proposed Class*